[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff (hereinafter referred to as "the Bank") proceeded on its four count Second Amended Complaint dated August 23, 1994 against the defendant Welch Center Associates Limited Partnership (hereinafter "Welch"); the defendant Branig New Haven Corporation (hereinafter "Branig"); and the defendant 495 Congress Avenue Associates Limited Partnership (hereinafter referred to as "495 Congress"). The complaint seeks foreclosure of a mortgage, deficiency judgment, declaratory relief and damages.
The First Count of the Amended Complaint alleges, inter alia, that on December 28, 1989, Welch and Branig, who is a general partner of Welch, a limited partnership, borrowed $2,400,000.00 from the Bank. They executed and delivered a mortgage note payable to the Bank. The defendant Welch executed and delivered to the Bank a mortgage deed (hereinafter "the Mortgage") wherein it conveyed a first mortgage in certain real property it owned at 495 Congress Avenue, New Haven, Connecticut (hereinafter referred to as "the mortgaged premises"), dated December 28, 1989 and recorded on January 2, 1990. In addition to the mortgage, as further security Welch executed and delivered an Assignment of Rents dated December 28, 1989 and recorded January 2, 1990. Also, as further security Welch executed and delivered a Security Agreement (hereinafter referred to as "The Security Agreement"), which granted to the Bank CT Page 12897 a security interest in all furnishings, furniture equipment, inventory, fixtures, personalty and chattels (hereafter referred to as the "collateral") located at Welch's property at 495 Congress Avenue, New Haven, Connecticut. Welch, on December 28, 1989, executed and delivered to the Bank a UCC-1 Financing Statement (hereinafter "UCC-1") evidencing the Bank's security in the aforementioned collateral which was filed with the Secretary of State of Connecticut and recorded in the land records for the City of New Haven. The Bank alleges that on July 1, 1993 Welch failed to make payments on the note. The Bank gave notice to Welch of the default and accelerated payments of all sums due under the mortgage note. As to the First Count, Welch, Branig and 495 Congress do not oppose the right of the Bank to have a strict foreclosure decreed in its favor to the premises. The Bank introduced evidence that the amount of the debt due as of November 9, 1994, the date of the trial, is $2,350,142.63 principal, interest $312,822.46, late charges $26,053.83, legal fees $26,933.50, appraisal fee $4,000.00, environmental survey $4,100.00; the total debt being $2,724,052.42.
The appraisal as to the value of the property for purposes of this hearing (Exh. A) is $1,865,000.00. The defendants do not dispute that a strict foreclosure enter as to the First Count.
The defendants Welch and Branig argue strenuously as to the relief sought under the Second Count of the Amended Complaint which essentially seeks a declaratory judgment that the nonrecourse language of the note does not prevent the Bank from seeking a deficiency against Welch and Branig on the grounds that they negligently and intentionally impaired the security of the loan. The Third Count of the Amended complaint seeks a declaratory judgment determining the Bank's rights under a parking agreement between Welch and 495 Congress. The Fourth Count of the Amended Complaint essentially seeks damages for the failure of the defendant Welch to assemble and turn over the collateral securing the loan under the UCC-1; proceeds from the sale of the collateral and attorney's fees.
In the Post Trial Briefs of the defendants, Welch and Branig argued the issues as to the right to a deficiency and failure to assemble the collateral. 495 Congress argued its special defense claim that the Bank cannot foreclose on the parking rights because the property is owned by 495 Congress and that it is not included in the mortgage deed. Further 495 Congress argues, the Bank is not entitled to the relief sought because the parking agreement is not a lease but rather a license requiring the Bank to proceed against CT Page 12898 495 Congress in accordance with Article 9 of the Uniform Commercial Code, Conn. Gen. Stat. § 42a-9-501 et seq.
Peter Beekman of Greenwich, Connecticut (hereinafter "Beekman"), in this case wore many hats. He was essentially in control of the entities involved in the overall transactions from the inception of the financing to date. During trial to assist the Court in understanding the interrelationships of the various entities, the defendants provided a chart (Defendant's Exh. 7):
WELCH Center Associates, L.P.
 __________________________ | Welch Center Assoc. L.P. | | 33 Limited Partners | |__________________________| |
| ________________________|___________________________ | | | 2nd Mortgage Day to Day Management General Partner Working Capital Loans Working Capital Loans | Parking Agreement Cash Flow Loan | | | | | | | | | | | | | ________|___________ _______|__________ ___________|__________ | 495 Congress Ave. | | ICON Group, Inc. | | Branig New Haven | | Assoc, L.P. | | | | Corp. | | ICON Group, Inc. |____| PDB — President |____| PDB — President | | — Gen Ptr. | | | | Owned by ICON Group, | | 2 Limited Partners | | Owned by PDB | | Inc. | |____________________| |__________________| |______________________|
Welch Center Associates L.P. is the owner of the mortgaged premises; Branig New Haven Corp. is a general partner of Welch. PDB, Beekman, is President of Branig. Icon Group Inc. (hereinafter "Icon") is owned by Beekman and is the managing agent for the day-to-day operation of Welch. 495 Congress Avenue Associates L.P. is the owner of the parking lot which rents 56 parking spaces to Welch for the tenants of Welch (Plaintiff's Exh. C). The value of the mortgaged premises is substantially adversely impacted without the use of the parking spaces. The Bank seeks a declaratory judgment as to their rights in the 56 spaces since their tenants need CT Page 12899 parking. An examination of the appraisal of the property (Plaintiff's Exh. A) at page 15 assumes the site improvement, the macadam paved parking area providing a total of 56 parking spaces, adequate walkways and drive areas. The defendants agree to a 21 day law day the minimum period allowed considering appeal periods. 495 Congress asserts that the right to rent is not part of the mortgage. The Bank asserts that the Parking Lease Agreement (Exh. C) is part of the loan transaction and is security for repayment of the indebtedness evidenced by the note (Exhs. H and V), and in exercising its Assignment of Rents assumes Welch's rights and interest under the Parking Lease Agreement (Exh. BB). Notice to exercise the Assignment of Rents was given on January 20, 1994.
The court will first address the issues raised by the Amended Complaint and the defenses of Welch and Branig. The defendants Welch and Branig assert that the issues are as follows (Post Trial Brief of Welch and Branig):
 "A. Has The Plaintiff Proved That It Has A Right to Foreclosure Of The Mortgaged Property?
 B. Has The Plaintiff Proved That The Value Of The Mortgaged Property Has Been Impaired?
 C. Has The Plaintiff Proved That Defendant Welch Has Failed To Assemble the Collateral?"
The court has already answered the first issue.
As to the second issue, the defendants assert that the Bank is not entitled to a deficiency because the note is nonrecourse. The language of nonrecourse is contained in paragraph 39 (Exh. K), which reads as follows:
 39. By accepting the Mortgage and the Note, the Mortgagee agrees that the promise of the Mortgagor contained in the Note to pay the Principal amount thereof with interest, is included therein for the sole purpose of establishing the existence of said indebtedness, the Mortgagee's source of satisfaction of said indebtedness and of any sum of money which is or may be payable under the Note or the Mortgage or other Lien Instruments is limited to the Premises, the rents, revenues, CT Page 12900 issues and profits therefrom, whether collected or uncollected, the improvements and the rights in condemnation awards and insurance policies and proceeds therein described, and that the Mortgagee will not seek or be entitled to enforce out of any other assets of the Mortgagor or any party constituting the Mortgagor any judgment for any sum of money which is or may be payable under the Note or the Mortgage or other Lien Instruments, or for the performance of any of the obligations of the Mortgagor under the Mortgage or the Lien Instruments, or for any deficiency remaining after foreclosure of the Mortgage; provided, however, that nothing herein contained shall be deemed to be a release or impairment of said indebtedness or the security therefor intended by the Mortgage or any of the Lien Instruments, or shall preclude the Mortgagee from foreclosing the Mortgage, in case of any default under the Mortgage or the Note or from enforcing any of its rights to enforce or realize upon its security under the Mortgage, including, but not limited to, obtaining the appointment of a receiver or putting into effect the Assignment of said Rents, revenues, issues and profits contained therein or in any collateral assignment of leases. Notwithstanding, the foregoing shall not be effective if Mortgagor intentionally and/or negligently impairs the value of the Premises; further, the Mortgagor agrees to and hereby does indemnify and hold harmless the Mortgagee from and against any and all loss, cost of expense incurred by the Bank and arising out of or in any way connected with the application of Connecticut General Statute Annotated 22a-452a to the Premises or any part thereof. In furtherance of the foregoing, Mortgagor covenants and agrees to take all steps necessary in order to prevent any lien pursuant to said statutes from attaching to the Premises or any part thereof." [Emphasis added] CT Page 12901
The language which the Bank relies upon to have the Court declare that the nonrecourse is not effective has been emphasized. The Bank claims that the mortgagor has "intentionally and/or negligently impaired the value of the premises and seeks thereby a deficiency against Welch and Branig.
The Bank introduced evidence to attempt to establish that the security was affected and diminished by the actions of Beekman who had control of all the entities involved in this transaction. The Bank argues that a deficiency is likely because the debt totalled $2,724,052.42 and that the value of the property (Exh. A) is $1,865,000.00. The Bank recognizes the nonrecourse language under paragraph 23 of the note (paragraph 39 of the mortgage deed) that the Bank's recovery is limited to the mortgaged premises, the rents and profits therefrom and other collateral pledged as security for the loan. The Bank claims it is entitled to recover a deficiency upon showing the security was diminished intentionally or negligently. The Bank produced evidence that Beekman through his control of Welch and Branig made substantial payments to Icon Group and 495 Congress after the default of the loan in July 1993. Beekman testified that the payments made to Icon and 495 Congress were for bona fide indebtedness due to those identities and in accordance with Welch's liabilities. Icon and 495 Congress had advanced funds to Welch in order for it to continue operation. Welch argues that notice of the Assignment of Rents was not exercised until January 20, 1994. The Bank was fully aware of the various identities involved in this transaction. The Bank and Welch and Branig structured a financial deal represented by experienced counsel. Welch and Branig, who the Bank wanted involved on the note, bargained for a nonrecourse note. The Bank was aware of the financial liabilities of Welch and Branig. The last check ordered to be paid by Beekman out of the Welch accounts was dated January 25, 1994, payable to Icon for $10,000.00 (Exh. AA). The other payments — Icon for $125,000.00 dated July 13, 1993 (Exh. X), Icon for $55,000.00 dated August 12, 1993 (Exh. Y), and Icon for $82,866.74 dated November 18, 1993 (Exh. Z). The payments out of the Welch accounts are the intentional acts the Bank asserts to overcome the effect of the nonrecourse provision. No fraud is alleged on the part of Beekman. No claim can be made that when he exercised his judgment to pay for prior bona fide indebtednesses he did not have the authority to do so. The Bank could have asserted its rights under the collateral within the Security Agreement earlier than January 20, 1994, in fact after the first notice of default. From the language used in the nonrecourse provision and also argued by Welch, the payments by Beekman, as discussed, made CT Page 12902 prior to the notice exercising the Bank's right to the collateral under the Security Agreement have not been shown to have effected the value of the premises. If anything, it would have only effected the cash position of Welch to pay future rents if there was not a sufficient cash flow being derived from the building. The parties bargained for a nonrecourse provision, the Bank did not assert any rights to the Security Agreement until the notice on January 20, 1994.
Beekman further testified that the shortfall occurred because there was a return of rentals to the tenant, all affiliates of Yale University Hospital/Medical School for fit ups made by the tenant, and the delay in payments of pass along income owed by the tenants. During that period Welch incurred ongoing management fees and 495 Congress had delayed payments under the lease. To keep the project going Welch incurred bona fide indebtednesses which were paid for by Beekman. Again there is no allegation of fraudulent transfers by Beekman. Accordingly, the Court finds the Bank has failed to meet its burden under the Second Count. The Court cannot grant the relief sought to declare the note to be other than nonrecourse as bargained. The Court agrees with Welch's and Branig's cited authority.
 Well-established case law holds, however, that the owner of property maintains ownership and control of the rents until the mortgagee/assignee exercises its rights over them. Cooper v. Davis, 15 Conn. 556, 560-61 (1843); City Lumber Co. of Bridgeport, Inc. v. Murphy, 120 Conn. 16, 19, 179 A.2d 339 (1935); In Matter of Guay, 138 B.R. Rptr. 3 (Bankr. D. Conn. 1992); In Matter of Coniam, 9 B.R. 306 (Bankr. D. Conn. 1981); Matter of Sansone, 126 B.R. 16 (Bankr. D. Conn. 1991).
To address the question as to whether the nonrecourse provision in the note and mortgage is not effective because Welch/Beekman made payments to Icon rather than payment on the parking lease and that those payments were negligently made and affected the mortgage premises is likewise unavailable to the Bank. There is no proof in this case other than perhaps equitable principles that Welch owed a duty to pay down the mortgage rather than pay other creditors. The Bank argues that Beekman made these payments on the past obligations rather than on the parking lease effected the value of the mortgage premises. CT Page 12903
The inequities arise only from the fact that one person, namely Beekman, would benefit from being paid an outstanding obligation rather than the Bank. One cannot overlook the legal rights and obligations of the parties. No claim or allegation was pursued that the Court should pierce the corporate veil of the separate identities known to the Bank.
The Court now addresses the Third Count which seeks a declaratory judgment that the Bank is entitled to the benefits of the Parking Lease Agreement enjoyed by the defendant, Welch, and such other further relief the Court deems just and proper. In the parties' original briefing, post trial arguments and defenses were addressed by counsel for the defendant 495 Congress as to the Third Count.
The Court has weighed and examined the arguments of the defendants along with the documents introduced.
Jack S. Lipson, an attorney licensed in Connecticut since 1974 who specializes in real estate and secured finance, represented Welch and 495 Congress, who provided an opinion letter to the Bank dated December 28, 1989 (Exh. O). The Bank relied upon the opinion letter in making the loan. His opinion in essence stated that the loan documents were binding on the borrower and enforceable in accordance with their terms. No interpretation of the Assignment of Rents was made by Attorney Lipson, so now the Court is called upon to establish what was meant by the Assignment of Rents.
The Bank seeks a declaratory judgment to confirm that the Bank assumed and may assume Welch's rights under the Parking Lease Agreement. 495 Congress claims the Bank is not entitled to the benefit of the lease and whatever benefits should be processed under Article 9 of the Uniform Commercial Code. The Court is called upon to determine whether the agreement under the Lease Agreement is a lease or a license. If it is a lease, it would constitute an interest in land; if determined to be a license, it would be considered personalty and be controlled by Article 9 of the Uniform Commercial Code for Connecticut.
On September 5, 1989 (Exh. 14) Icon made application for the loan of $2,400,000.00 with its proposed terms. Icon in paragraph 3 set out the relationship of 495 Congress and Welch. Beekman stated that 495 Congress, a partnership wherein Icon holds 98% interest rehabilitated the building, the mortgaged premises and sold the property to Welch. "Additionally 495 owns and leases an CT Page 12904 adjacent half acre to Welch. The later [sic] property provides ample parking for ten tenants." This letter is signed on behalf of Welch and Icon, the manager, by Beekman as President under the express terms of the Assignment of Rents (Exh. V). Welch's rights as lessee were conveyed to the Bank. Welch provided that "to secure the rights and interests of The [Bank]" the said Welch does hereby
 GRANT, BARGAIN, SELL, TRANSFER, ASSIGN, CONVEY, and set over, and by these presents has granted, bargained, sold, transferred, assigned, conveyed and set over unto the said Mortgagee, its legal representatives and assigns forever, all of its rights, title and interest in a Parking Lease Agreement by and between 495 Congress Avenue Associates Limited Partnership, as Lessor and Mortgagor, dated as of October 3, 1986 and recorded in Liber 3677, Page 212 on May 20, 1987 in the New Haven Town Clerk's Office, Management Agreement by and between Mortgagor, as Owner and Icon Properties Inc., as Manager dated October 3, 1986 as assigned to and assumed by ICON Group, Inc., pursuant to an Assignment and Assumption Agreement dated January 1, 1989, and all of the rents, revenues, issues and profits now due and unpaid, and hereafter to become due and issuing from the Mortgaged Premises above described.
On January 20, 1994 the Bank exercised its rights under the Assignment of Rents. Notwithstanding the argument of 495 Congress that it is a license rather than a lease it accepted two payments due under the Lease Agreement (Exh. C).
Some of the elements that the Court is asked to consider by the Bank is that at all times up to the time of pleading the Special Defense that it is a license, the parties called it a lease and were under the impression it was a lease. The notice of the lease was recorded in the land records (Exh. D). The agreement recites at paragraph 3 that Welch "shall operate and have control of the spaces that are subject to this lease agreement. Lessee [Welch] may at its option mark any of such parking spaces for the exclusive use of designated occupants of the building and subject to the provisions hereof include such spaces within any leases of space in the building as appurtenances thereto." The lessor 495 CT Page 12905 Congress granted the right to use 56 designated parking spaces to Welch who, in turn, had a right to control the 56 parking spaces to fit its tenants' needs in the mortgaged premises. There was no prohibition within the lease against assignment.
 "A lease transfers an estate in real property to a tenant for a stated period, with a reversion in the owner after the expiration of the lease. Its distinguishing characteristic is the surrender of possession by the landlord to the tenant so that he may occupy the land or tenement leased to the exclusion of the landlord himself.' Jo-Mark Sand Gravel Co. v. Pantanella, 139 Conn. 598, 601, 96 A.2d 217. The tenant acquires an interest in the real estate giving him the right to maintain ejectment or trespass against the landlord. Carroll v. Cooney, 116 Conn. 112, 115, 163 A.2d 599. And where the entire premises are leased, in the absence of any agreement, either expressed or implied or by covenant to the contrary, the tenant has the right of exclusive possession and control of the entire premises and the landlord or his agents or contractees have no right to enter upon the leased premises. Central Coal, Apron Linen Service, Inc. v. Indemnity Ins. Co., 136 Conn. 234, 237, 70 A.2d 126; see Lyon v. Bethlehem Engineering Corporation, 253 N.Y. 111, 113, 170 N.E. 512; 49 Am.Jur.2d, Landlord and Tenant, §§ 82, 226."
Monarch Accounting Supplies Inc. v. Prezioso, 170 Conn. 659, at pp. 663, 664.
At the time that the Lease Agreement was executed the parties used the terms lease, lessee and lessor. The parties did not need prior approval as to who could use the 56 parking spaces. The lessee (Welch) in this case, although in control of Beekman had the right to provide a parking space for its tenants. Certainly it was a factor for future tenants to know it had available parking. The Bank cites Thiokol Chem. Corp. v. Morris County Board of Education,41 N.J. 405 (1964), to further support its argument that it was a lease. In that case as in this, the lessor (495 Congress) did not reserve unto itself the right to revoke the agreement. The CT Page 12906 agreement was for 56 spaces, which at the time represented all the land that was designated for parking to the premises. The 56 spaces could have been sublet to Welchs' tenants. Welch had exclusive control of a designated area. See Jo-Mark Sand GravelCo., 139 Conn. at 601.
495 Congress argues that since the lessor, 495 Congress, had a right to develop the rest of the property, as provided in paragraph 2 of the Lease Agreement, the transfer of 56 spaces is a license. A lease of less than the entire parcel may be a lease if the parties intended it to be such.
The Bank argues that the rights under the Parking Agreement are "ripe" for adjudication. There is a substantial controversy between the parties which requires an immediate decision. The Court agrees with the authorities advanced by the Bank. To suggest that the Bank has rights that can only be addressed under Article 9 of U.C.C. is not correct for this case. Certainly, Beekman, a sophisticated businessman, who had control of all the entities in this transaction could have refused to convey absolutely Welch's rights in the 56 parking spaces at the time of the loan. Nonetheless it was given as additional security for the loan and was all part of the lending arrangement.
The court concludes it was a lease, it was intended to be a lease and it was transferred to the Bank as additional security for the loan. Beekman now seeks to have the Lease Agreement declared a license and accordingly be sold in accordance with U.C.C. rules. The Court can only conclude from all the evidence that the remaining property owned by 495 Congress, although it has potential for further development, no immediate plans exist. Further, Beekman has decided to allow a strict foreclosure; bail out of the deal and get what further monies he can get for 495 Congress, the second mortgage in this transaction, owned by Icon which is Beekman and two limited partners (See Exh. 7). The value of the property has further been impacted unfavorably by the lesser cash flow from the lease in effect. Because of the nonrecourse provision of note and mortgage and because the Bank has failed to demonstrate that such provision should not be enforced, the Bank finds itself with only one remaining asset, the parking lease, the security for the loan which effects the value. Again the value of the property as appraised included the benefits of the 56 space lease. The rentals for such leased space is 1% of lessee's gross collected revenues. Lease payments were payable monthly in arrears seven days following the last day of each month. The arrangement for rentals was CT Page 12907 apparently part of a structure for tax reasons. The lease conveyed an interest in land (99 year lease) to Welch.
495 Congress argues that the mortgage deed does not include the legal boundaries of the 56 parking spaces and therefore cannot be part of the title that passes to the Bank by foreclosure. The only property in the Mortgage Deed (Exh. K) is the boundaries containing the Welch Center building. 495 Congress cites LawOffices of C. Kendall Harret v. Commerce Savings Association,824 F. Sup. 1159 (W.D. Tex. 1993) for authority that the mortgage deed did not include parking spaces when a foreclosing lender sought to take the building's lessee interest in 260 parking spaces in an adjacent parking garage. In that case the Court held that the parking was not an appurtenance because the lender (Bank) could not show that it was necessary and indispensable to full use and enjoyment of the building. The Bank argues that this case differs from law offices in that there is a specific Assignment of Rents which assigns Welch's rights in the Parking Lease Agreement (Exh. V). The fact that the rights to the 56 parking spaces is contained in the Assignment of Rents loan document does not alter the fact that it was part of the loan arrangement of the parties intending to be part of the security for the loan and in this case is an appurtenance within the language of the mortgage deed.
The parking spaces as discussed when Welch's premises were established included 56 parking spaces surely an appurtenance under a 99 year lease to the premises. The parking spaces in this case are necessary. Accordingly, the Court finds that the parking spaces, although not specifically described in the Mortgage Deed, is an appurtenance that was intended to be security for the loan. This Court has not stretched the meaning of appurtenances attached to the parking spaces because from an examination of all the documents and the nature of the Parking Agreement as an appurtenance of Welch is covered by the mortgage deed. Accordingly, the parking rights may be foreclosed.
The parties intended to grant a foreclosable interest in the parking lease. The Bank has asked for a declaratory judgment on the Third Count which this Court grants. The relief sought and arguments and evidence considered in the Special Defenses of the parties, notwithstanding the strict foreclosure, is extended to the parking lease of the 56 spaces and the decree should describe the boundaries therein.
As to the Fourth Count, Welch and Branig assert that the Bank CT Page 12908 has failed to prove that they failed to assemble the collateral. As discussed, the payment made by Beekman to the other entities was not and cannot have been restricted prior to the Bank's exercising its right on January 25, 1994. There was no duty on the part of Welch to account for rents prior to the Bank exercising its rights under the assignment of rent until January 1994.
 With respect to the mortgagor-mortgagee relationship, it is well settled that a mortgagor has no duty to account to the mortgagee for rents, issues and profits accruing from the Mortgaged Property:
 By repeated decisions, it is now fully established, that a mortgagor, before his right of redemption is foreclosed, continues the owner of the real estate mortgaged; that he is not accountable for the rents and profits, nor liable, in an action at law, for waste committed while in possession. The mortgagee has merely a lien upon the property for the security of his debt, by virtue of which he may obtain possession and appropriate the pledge in payment of his debt.
 The mortgagor has, indeed no right, by commission of waste, to render the security inadequate. By the appropriate remedy for such conduct is, by way of injunction. If the security is impaired, by cutting and tearing away the wood and timber, the mortgagee has no power to cease them, after they have been severed and carried away; but his duty, in such case, is to restrain the mortgagor from such acts, by an injunction.
Cooper v. Davis, 15 Conn. 556, 560-61 (1843).
The Bank who waited to exercise its right cannot now complain that Welch and Branig failed to assemble the collateral.
In conclusion, Attorney for the plaintiff Bank is ordered to prepare the appropriate judgment file incorporating the following orders in accordance with this opinion.
FIRST COUNT: A decree of Strict Foreclosure is entered. The CT Page 12909 law day for defendant Welch shall be set on the twenty-first day hereof. Law days for subsequent incumbrances is set in inverse order of their priorities as appear on the land records of the City of New Haven. The judgment file shall include the rights to the 56 parking spaces as provided for in the Third Count and in accordance with this opinion. All fees, including attorneys' fees and experts' fees, are hereby approved.
SECOND COUNT: Judgment in favor of the defendants in accordance with this decision.
THIRD COUNT: Judgment in favor of the plaintiff declaring the benefits of the Parking Lease to be foreclosed as provided for in this decision.
FOURTH COUNT: Judgment in favor of the defendants in accordance with this decision except as provided for foreclosure of the Parking Lease Agreement.